Violet A. I. Huston, Appellant, *v.* Philippa Harrison, The Pennsylvania Company for Insurance on Lives and Granting Annuities, Philippa Harrison, Executrix of the Estate of Teresa L. C. Anderson, and The Fidelity Trust and Safe Deposit Company.

*Equity—Evidence—Responsive answer.*

Where a bill in equity against the executrix of the estate of plaintiff's mother was filed nearly eight years after the account of the executrix had been adjudicated by the orphans' court, which averred the fraudulent appropriation by the executrix of certain property belonging to the dece-

dent, in which plaintiff has an interest as heir and legatee, and the fraudulent omission to include it in the account; and that the facts alleged in the bill became known to plaintiff only recently before filing the bill, and the answer of defendant directly and explicitly denied the averments of fraud in the bill, and claimed ownership of the property by the defendant, the burden is on the plaintiff to meet the responsive answer and overcome it with two witnesses, or with one witness and corroborative circumstances.

Argued April 12, 1895.  Appeal, No. 272, Jan. T., 1895, by plaintiff, from decree of C. P. No. 4, Phila. Co., Dec. T., 1892, No. 610, dismissing bill in equity.  Before GREEN, WILLIAMS, McCOLLUM, DEAN and FELL, JJ.  Affirmed.

Bill in equity for an account.

The case was referred to John C. Grady, Esq., who reported as follows:

"FINDINGS OF FACT.

"1. The defendant, Philippa Harrison, was first married in England to a sea captain, named George Dani, who died Nov. 28, 1856.  Dani left several properties in Brunell street, Liverpool, and some shares of stock in the Royal Insurance Company. Prior to his death Teresa L. C. Francis, (afterwards Teresa L. C. Anderson mentioned in the bill,) who was a niece of the defendant, Philippa Dani, lived with her in England.  Dani having died, his widow married in England John Harrison, in April, 1858, and shortly afterwards they, with Miss Francis, removed to Philadelphia.  For a while the Harrisons conducted a saloon or tavern on Twentieth street, below Callowhill street, until about 1860, when they opened a cloak store at No. 20 South Eighth street.  Afterwards, in 1863, the business being prosperous, the Harrisons established another store at No. 60 North Eighth street under the name of Francis & Co., in which Miss Francis was stationed with other girls as a saleswoman. The manufacturing, however, was done at the lower store, and it was clearly established by the testimony that Miss Francis was not interested in the business, except as an employee, her name being used merely as a device to keep the customers from suspecting that the two establishments were in reality but one.

" About three years afterwards, in 1866, Miss Francis married Oliver H. Anderson, a house painter by trade, who, for

awhile, followed his business as a journeyman, but shortly fell into dissolute habits which caused him to leave the home of the Harrisons with whom he and his wife had continued to reside. Mr. and Mrs. Anderson had two children, Clara, born Nov. 25, 1866, married Harry R. Stoops, April 30, 1890; and Violet, the complainant, born in 1870, and married W. M. Huston, in March, 1886. Mrs. Anderson continued to live with Mrs. Harrison until her death, in December, 1883, and her children continued to live with Mrs. Harrison, who assumed their education and care, until their respective marriages. Anderson himself died in 1888, but it appears had not supported his family for many years.

"About 1870 the health of John Harrison, the head of the entire establishment, began to fail. In 1871, the Harrisons disposed of the upper store, 60 North Eighth street, to Mrs. Bush, and in 1872 they disposed of the lower store, 20 South Eighth street, to Mr. Marter, and retired from business with a handsome competency. In the following year the entire family went to England and lived abroad until 1876, when they returned to Philadelphia and resided here until John Harrison's death, April 28, 1882. His will was dated in England as far back as 1862, apparently at the time of his visit to obtain funds with which to establish the store at 60 North Eighth street. In it he made his wife, Philippa Harrison, executrix and tenant for life of his personal estate, and at her death bequeathed it to Mrs. Anderson for her life, then to her children. His personal estate was inventoried at $134,014, and did not include any of the bonds or securities now in dispute. On the day following the probate of the will, Mrs. Harrison appointed The Pennsylvania Company for Insurances on Lives and Granting Annuities her agent for the collection of the income.

"Mrs. Anderson was about twelve years younger than her aunt, Mrs. Harrison, who is now about sixty-seven years of age. In 1882 their respective ages were therefore about forty-three and fifty-five years. Mrs. Anderson was not only younger, but better educated and more accustomed to writing than Mrs. Harrison, and for some time had been in the habit of attending to the business matters of the whole family. John Harrison for a number of years had rented a box in the safe deposit vaults of the Pennsylvania Company for Insurances on Lives and

Granting Annuities, in which were kept not only his own securities, but also those of his wife and those belonging to Mrs. Anderson; and also the $7,000 of City Loan and other registered securities in the name of himself and Mrs. Anderson as trustees for the latter's children.

" Toward the close of his life the active management of affairs was surrendered to Mrs. Anderson, who, together with Mrs. Harrison, had the right of access to the said deposit box. Of this right Mrs. Anderson did not avail herself until March 25, 1880, when she began collecting the coupons. Except in this way, Mrs. Anderson never had possession of the bonds.

" Shortly after Mr. Harrison's death, his widow, accompanied by Mrs. Anderson and the two children, sailed for Europe, having first arranged with the Pennsylvania Company for Insurances on Lives and Granting Annuities to collect and remit the income of nearly all the securities in the box. On a certain day it appears that Mrs. Anderson arranged the details with Mr. Jarvis Mason, trust officer of the Pennsylvania Company for Insurances on Lives and Granting Annuities, and gave him instructions for remittance in a written paper prepared by Mr. Mason, dated June 6, 1882.

" Mrs. Harrison expected to be absent four years, so four years' or four and one half years' coupons were cut from most of the securities belonging to Mrs. Harrison, and a power of attorney was given by Mrs. Anderson for the collection of the interest upon certain securities registered in her name, including those held in trust for her children. Mrs. Harrison also executed powers of attorney for the collection of interest upon the securities of John Harrison's estate, to which she was entitled for life.

" During her stay abroad Mrs. Harrison was in negotiation with the heirs at law of her husband, whose will disposed only of his personal estate. Considerable correspondence on the subject passed between Mrs. Harrison and her counsel, E. Cooper Shapley, Esq., in which Mrs. Anderson, as usual, acted as her amanuensis and assistant.

" Mrs. Harrison, Mrs. Anderson and the children remained abroad, however, but a little over a year, returning in September, 1883. Shortly afterwards Mrs. Anderson died, on Dec. 2,

1883, leaving a will dated June 9, 1882, drawn by Mr. Shapley, in which she devised a property in Asbury Park to Mrs. Harrison for life ; bequeathed an annuity of $300 per annum to her husband, and the residue to the Pennsylvania Company for Insurances on Lives and Granting Annuities, as trustee for her children.   She also directed that Mrs. Harrison should take care of her daughters during their unmarried minority. Mrs. Harrison was appointed executrix of the will, and letters were issued to her.   The first visit she made to the safe deposit box after Mrs. Anderson's death was on Dec. 10, 1883, when she took with her the two grandnieces, who were then seventeen and thirteen years of age.   Their care, education and maintenance devolved upon Mrs. Harrison, who, having no children of her own, looked upon them as fully supplying the place.   They were liberally educated, clothed, and well provided for, until, and in a measure in the case of Clara, for some time after their marriage.

" In 1885 Mrs. Harrison filed her account upon the petition of Oliver H. Anderson, the husband of Mrs. Teresa L. C. Anderson, who had been separated for some years but was entitled to a small annuity of $300, under the will.   The account was prepared by E. Cooper Shapley, Esq., and in it the accountant charged herself with $12,500, the amount of the inventory, but claimed no credits, adding in place of the usual credits the following ' memorandum.—Inasmuch as any deductions for payments or charges would affect the amount eventually due the daughters of the decedent, the accountant has entered nothing on the debit side of the account.'

" The husband of the decedent, who was represented by counsel, endeavored to surcharge the accountant and the audit adjourned for the purpose of allowing the accountant to file a supplemental account, which took the form of an agreement between the parties to a surcharge of one registered bond of the city of Pittsburg, $1,000, and a deposit in the Philadelphia Savings Fund of $456.05.   Mr. Anderson was paid the arrears of his annuity and the balance was paid over to the trustee.

" In reference to this surcharge the master, after an examination of the record of the orphans' court and the testimony taken at the audit, is not surprised that the accountant, either from a well grounded belief that the items of surcharge actu-

ally belonged to her, or from a bona fide lack of knowledge that they did not, failed to include them in her account.

" The record shows that the account was adjudicated by the orphans' court and in due time confirmed absolutely.

" The city loans held in the names of John Harrison and Teresa Anderson for Clara were duly transferred to the Pennsylvania Company for Insurances on Lives and Granting Annuities as substituted trustee shortly after Clara came of age, and the loan held in trust for Violet was also transferred to the Pennsylvania Company for Insurances on Lives and Granting Annuities as trustee shortly after her marriage.    The latter event, which took place in March, 1886, removed Violet from Mrs. Harrison's household.    The marriage was a clandestine one without Mrs. Harrison's knowledge or consent, and was the first interruption of the domestic harmony.

Clara, in 1890, married Harry R. Stoops.    Since her mother's death Clara had been accustomed to attend to Mrs. Harrison's business for her, and Mr. Stoops even before his marriage advised with Mrs. Harrison as to investments, made purchases of securities and was given powers of attorney for the collection of interest.    This relation between Mrs. Harrison and Mr. and Mrs. Stoops continued until June, 1892, when a dispute arose between them as to the $34,000 City of Cincinnati bonds. Upon Nov. 2, 1892, Mrs. Harrison filed a bill in equity against Mrs. Stoops and the Fidelity Ins. Trust & Safe Deposit Co. in the court of common pleas No. 1, as of September term, 1892, No. 638, where she alleged that, reposing special confidence and trust in her grandniece, Clara H. Stoops, the complainant nominated and appointed her deputy or agent, which gave her full and free access to and control over the contents of her safe deposit box in the Fidelity Insurance, Trust and Safe Deposit Company ; that in said box, among certain other papers and securities were the $34,000 City of Cincinnati 7 3-10 per cent coupon bonds belonging to the complainant, and that, afterwards, without the knowledge or permission of the complainant, the said Clara H. Stoops rented another box in her own name, in which she placed these $34,000 bonds, refusing the said Philippa Harrison a key to the same.

" The answer of Clara H. Stoops admits that she rented a box of the Fidelity Insurance, Trust and Safe Deposit Com-

pany, and that she deposited the said bonds therein; but denied that they belonged to the complainant and claimed that she, the defendant, was the owner and had been the owner since June 15, 1888, by gift, from the complainant. She also admits that she retained the keys of the box and refused access thereto to the complainant. This bill is yet pending.

"Shortly afterwards, on Jan. 15, 1893, the present bill was filed by Violet A. I. Huston.

"II. The master now proceeds to the determination of the disputed ownership of the bonds mentioned in the bill. The contention of the plaintiff is based chiefly upon the memorandum or letter of instructions drafted by Mr. Mason and signed by Mrs. Anderson, dated June 6, 1882.

"By this letter the Pennsylvania Company for Insurances on Lives and Granting Annuities is directed to collect, under powers of attorney to it given, the interest from certain loans registered in the name of Mrs. Anderson, and also to collect ' the interest coupons which I have cut from the following bonds, and deposited with them to hold for my account.'

"As before stated, this arrangement was made just prior to the departure for Europe of Mrs. Harrison and Mrs. Anderson and the children, in order to provide for remittances during a contemplated absence of four years.

"After a careful consideration of the testimony the master is clearly of opinion that in making this arrangement with Mr. Mason, Mrs. Anderson was not acting for herself alone, but for Mrs. Harrison and the whole family in preparation for a sojourn abroad. The memorandum standing by itself is not sufficient to prove ownership in her, even if it were distinctly intended as a claim of title, as it would be merely a declaration by Mrs. Anderson in her own interest in the absence of Mrs. Harrison. But the master believes, and so finds, that this was unintentional on Mrs. Anderson's part, for it seems plain enough that her whole mission and object was to have the income collected from their joint securities in one agreement, and that she never intended to claim ownership or provide a pretext for litigation against her aunt, because, to the credit of both of them, there is no evidence of any quarrel or misunderstanding. The paper was drawn by Mr. Mason from a mere memorandum furnished him of the securities, and Mr. Mason's own impression was that Mrs. Anderson was acting for Mrs. Harrison.

"It was most conclusively shown that Mrs. Anderson acted as agent and amanuensis for Mrs. Harrison in all her other business matters. Not to multiply instances, it is impossible to read the correspondence between Mr. Shapley and Mrs. Anderson, and the letters which the latter wrote to Mr. Mason without seeing that she was accustomed in speaking of Mrs. Harrison's business and property to use the first person without the slightest apparent intention of causing any confusion of proprietorship. Mrs. Anderson used to write the letters, and sometimes Mrs. Harrison would sign them; sometimes Mrs. Anderson would sign them for her.

"Thus, for example, Mrs. Anderson wrote to Mr. Shapley July 25, 1882: 'Aunt wishes me to say will you be kind enough to get the house appraised [for collateral inheritance tax] as soon as you can, as she wishes it all settled up as early as possible, and please do it as reasonable as you can, as *I* shall have to stand the expenses.' And in Mrs. Anderson's letter she says, in speaking of the buying out of the shares of the collateral heirs of John Harrison in the Spring Garden street house, 'I am going to give them ten thousand dollars for a clear title.' Exhibit 26, signed by both Mrs. Harrison and Mrs. Anderson, the latter writes, again in reference to the proposed conveyance, 'I hold the reins in my hands, and I can do as I like,' etc. 'I thought my marriage settlement was lost or destroyed,' etc. 'My husband sold out my bonds, and with that money he bought the house,' etc. And 'I will not sell the house, and do not want to pay them a dollar.' All through her correspondence Mrs. Anderson identified herself completely with her aunt Mrs. Harrison, and used the '*I*' and the '*my*' with a perfectly innocent intention.

"No doubt is left in the master's mind that Mrs. Anderson was acting and writing as the 'business man' of the family.

"The complainant was not able to show that Mrs. Anderson was in fact possessed of the securities in dispute, or indeed of any property other than that accounted for by her executrix. Some city directories were produced to show that Mrs. Anderson was a partner of Harrison at the upper store, 60 North Eighth street, which store was conducted under the name of Francis & Co. This, however, as a mere ex-parte compilation of names is not competent evidence of the fact of partnership;

and, moreover, the entries in the directory are not invariable, most of them omitting the name of Terella Francis altogether. But the evidence produced by the defendant leaves no doubt in the mind of the master that the business name of Francis & Co. was only a trade artifice, and that Mrs. Anderson was merely a 'saleslady' or employee, differing only from the other employees in that she was a member of the Harrison household. It did not appear what salary she received, if any, but the other girls in similiar positions did not receive more than $10.00 a week.

"The question of this alleged partnership the master regards as important in the determination of the case. The burden of proof was, of course, upon the complainant, who averred that Mrs. Anderson was possessed of this large estate, to prove the fact, and the question of its derivation naturally arose. Her husband was intemperate, and contributed but little, if any, of his earnings as a house painter to his wife, and that she derived nothing from her family clearly appears from the evidence of her sister, Mrs. Beach, Where, then, did Mrs. Anderson derive this fortune ? In answer to this pertinent inquiry, the complainant attempted, as stated, to show upon the authority of a few entries in the old city directories that Mrs. Anderson was a partner in the business.

"The defendant, on the other hand, produced a large number of witnesses who clearly proved that Mrs. Anderson was not a partner, but simply an employee, and so far from being wealthy in her own right, was all her lifetime dependent on the bounty of Mrs. Harrison, her aunt.

"The master will refer briefly to the testimony on this head. Thus, G. W. Marter, one of the complainant's own witnesses, said (p. 136) that Mrs. Anderson told him that she was simply a saleslady. Mr. Marter's father was the purchaser of one of Harrison's stores in 1872, and was especially interested, as he said, in ascertaining the fact. J. C. Hutchins, another of complainant's witnesses, who knew the Harrison family since 1862, and whose store on Eighth street was next door, testified that Mrs. Anderson was a saleslady. Mrs. Gardeicke, who was an employee at the store and knew Mrs. Anderson like a sister said she was only a saleslady. Michael A. Durrell, Mrs. Mary W. Asay, Mrs. Isabella Neely, who were all co-employees with

Mrs. Anderson and knew her well, testified positively to the same effect; and Mrs. Eveleth, who acted with her mother, Mrs. Bush, in purchasing the lease of No. 60 North Eighth street, testified that Mrs. Anderson did not conduct herself as a partner.

" In addition, Mr. Edwin R. Hawkins, Theodore Wernwag, Henry M. Steel, Aaron DeWald, D. W. Chambers, David M. Chambers, and Edward Brown, who were old business friends and associates of Harrison, testified that Mrs. Anderson was not known as a partner or reputed as such.

" The learned counsel for the complainant moved to strike out this testimony, but the master regarded it as cumulative and corroborative of the fact, and therefore refused the motion.

" And finally, Mrs. Susan C. Beach, a sister of Mrs. Anderson, testified, emphatically, that Mrs. Anderson was not a partner in the business. She was not only qualified to know by reason of her relationship, but she was also employed as a saleslady herself in the store.

" It is true that the upper store was run in the name of Francis & Co.—Francis being the middle name of Mrs. Anderson. But it would be rash to infer from that circumstance that Mrs. Anderson was a partner, even if it were not so clearly explained by the witnesses, Mrs. Gardeicke, Mrs. Asay, Mrs. Neely, and Mr. Durell, who were employees of the establishment, testified that this was but ' a trick of the trade,' frequently practiced where two or more retail establishments were under the same management, and Mrs. Anderson frequently spoke of the arrangement as having been made with that end in view.

" The cumulative effect of this mass of disinterested testimony is irresistible, and the master therefore finds as a fact that Mrs. Anderson was not a partner in the business, and that no source appeared from which she could possibly have derived the property in dispute.

" The defendant's evidence, moreover, went much further than this. She not only showed that it was impossible that Mrs. Anderson could have accumulated the large fortune claimed in the bill, and that during her lifetime she never claimed an estate of such magnitude, but it was shown that Mrs. Anderson herself stated, shortly before her death, the amount of her savings corresponding to the sum actually

accounted for by her executrix. Mrs. Gardeicke was one of Mrs. Anderson's most intimate friends, beginning at the time of her employment as a saleslady at the upper store with Mrs. Anderson; was so intimate with her as to be bridesmaid at her marriage; visited her socially during her business career, and at times afterwards, considering herself almost as one of the family, particularly at a very important time in Mrs. Anderson's latter days, when she was considering a proposition to live with her husband. From this testimony it is not doubtful that if Mrs. Anderson had really possessed this alleged estate she would have accepted her husband's proposition; but as the income from $15,000 would not, in her mind, after maintaining a home including her husband, leave sufficient to defray the expenses of her daughters' education, she decided to remain with the Harrisons. How important then is Mrs. Gardeicke's testimony.

" ' Q. You were, of course, employed on a salary yourself? A. Oh, yes! and I always understood that Mrs. Anderson was; she always told me that she had a salary, but she never told me just how much she had. Q. Do you remember any conversation with Mrs. Anderson as to the amount of money which she had saved? A. Oh, yes! I distinctly remember one day she came down to my house; she was quite sad that day; and we had a conversation with regard to her staying with Mrs. Harrison. I believe Mr. Anderson wanted her to come and live with him. Q. Did they live together at the time? A. Oh, no! and I advised her to go with Mr. Anderson, and we had a long conversation about it, but she did not think she could afford to go with Mr. Anderson because her aunt would disinherit her.'

"And again: ' Q. Did you then have any conversation with Mr. Anderson at that time relative to her property? A. Well, at that time I advised her to go with Mr. Anderson, and I asked her how much money she had when she said she could not afford to go. I said, "Have you not enough to live on?" and she said, "No." "Well," I said, "Terella, how much have you got?" She told me she had only $15,000, and I said, "Well, that is enough to get bread and butter, and I would go, and I think Mrs. Harrison will forgive you; it will be all right after a while." Q. What did she reply to that? A. She said no;

her children had to be educated and she could not educate them as she wanted them educated.'

" That conversation occurred in 1882.

" And, again, in Mrs. Gardeicke's testimony, Mrs. Anderson is quoted as saying, ' She told me repeatedly she had no one to thank but her aunt, Mrs. Harrison.'

" The probabilities of the case are on other grounds strongly with the defendant.   Thus, it seems incredible that Mrs. Anderson's husband, the father of complainant, should not know the existence of his wife's fortune, and if he possessed that knowledge how strange it is that its existence should not have been disclosed at the time in order that he might be entitled to a third of the fortune instead of $300 a year.   He was represented by counsel and was endeavoring to get all he could. Mr. Anderson and his wife had lived together at the Harrisons' home when business was prosperous and money-making.   It is not easy to believe that he did not understand their affairs. He must have had knowledge of the condition of his wife's finances, but neither he nor any one else seems to have considered her wealthy.

" Again, the conduct of Mrs. Harrison is not easily reconcilable with the complainant's theory of the case.   According to this, Mrs. Harrison, as soon as her niece, Mrs. Anderson, died, took possession of a large estate, appropriated it and the income thereof to her own use, concealed her fraud from her innocent victims, and for years has been leading a life of fraud, treachery and hypocrisy.   On the contrary, the first visit made by Mrs. Harrison to the safe deposit box after Mrs. Anderson's death was about one week thereafter on December 10, and she was accompanied by both her grandnieces ; and on the 18th of the month she appointed Clara her deputy on the books.   Ever afterwards Clara took her mother's place as assistant or agent, and even before her marriage to Mr. Stoops, the latter was accustomed to collect her interest and make her investments. She consulted Mr. Stoops about her deed of trust before she made it, and he himself testified he handled all of the estate. It is hardly possible that Mrs. Harrison, if engaged in the perpetration of a fraud, should have selected as her agents and confidants the persons most of all concerned to prevent it.

" Again, when Mrs. Harrison filed her account she claimed

no credits or commissions because she did not wish to diminish the daughters' inheritance. If her object was avaricious, she might easily have claimed the usual allowances. This account, as well as Mrs. Anderson's will, was prepared by E. Cooper Shapley, Esq., a careful and highly reputable member of the bar, who had no idea he was innocently assisting in the perpetration of a gross fraud.

"So, too, it was established by the testimony that Mrs. Anderson and her daughters were supported by Mrs. Harrison and treated with great indulgence. It is hardly likely that a woman possessed of such a large estate would be supported in this way or consent to live upon the bounty of another.

"It not only appears from what has been said that Mrs. Anderson was not possessed of any independent fortune and had no more than what was derived from the savings of her wages and gifts from Mrs. Harrison, but it further appears to the satisfaction of the master that Mrs. Harrison had means of her own independent of her husband. It was testified to by numerous witnesses that Mrs. Harrison derived a not inconsiderable estate from her first husband, Dani, which was used either as capital in the business, or lent to her husband. According to Mrs. Gardeicke's testimony, it was a generally known fact, and Mrs. Anderson had always said so. Mr. Durell, another employee, testified that Mrs. Anderson told him Mrs. Harrison had lent her husband the money. Mrs. Asay, to the same effect. Mrs. Anderson herself in her letter to Mr. Shapley states that the house was bought with Mrs. Harrison's money. H. H. Brown testified that Mrs. Anderson told him she brought Mrs. Harrison's money to America because it could be used to better advantage. Mrs. Beach to the same effect. The latter, who was a sister of Mrs. Anderson, said, ' My Aunt Philippa had property in England left her by her first husband. About the time that the premium on gold was three for one of greenbacks, my sister Teresa (Mrs. Anderson) went to England and disposed of some of the property and brought the money back to Philadelphia. The amount I do not know, or the amount for which the property was sold. The money she brought back was put into the business conducted by John Harrison. Whether the money was given or lent I do not know.'

"The amount of Mrs. Harrison's separate estate did not ap-

pear with exactness from the testimony.  A good deal was said about a marriage settlement made between Mr. and Mrs. Harrison at the time of their marriage, and some of the witnesses testified to a portion at least of its contents as tending to show what property belonged to Mrs. Harrison.  This marriage settlement was claimed to have been lost, but the counsel for the complainant moved to strike out all the testimony relating to it on the ground that its loss or destruction did not sufficiently appear from the evidence to enable secondary evidence to be given.  In the opinion of the master it matters but little whether it is stricken out or not.  Although secondary and perhaps defective, yet it is probably the best the defendant could secure, as she was herself incompetent and not permitted to testify as to matters occurring before Mrs. Anderson's death.  However, it is sufficiently demonstrated otherwise, and the master finds as a fact that Mrs. Harrison's separate estate provided the capital, and so far as the evidence goes all the capital which established both stores on Eighth street, out of which the money now in controversy was derived, while John Harrison contributed his skill and business knowledge which, with the coöperation of his wife, led to the success of the business.  The master accordingly, after a careful consideration of the evidence and the probabilities of the case, and the exhaustive arguments of counsel on both sides, is of opinion, and so finds, that the defendant, Philippa Harrison, has shown herself in opposition to the claim of the plaintiff, to be the actual owner of the disputed property.

"There was a further claim made by the plaintiff against Mrs. Harrison which was, strictly speaking, hardly pertinent to the issue, nor in fact raised by the bill.  The master, however, will discuss it rather than appear to have passed it without notice.

"It appeared, after Mrs. Anderson's death, Mrs. Harrison, as her executrix, collected the interest upon the securities included in her account until, in accordance with the decree of the orphans' court, she transferred the securities to the trustee under the will.  This interest and the interest upon the city loans, etc., registered in trust for Clara and Violet were not included in Mrs. Harrison's account.  The defendant has the technical defense that the adjudication of her account was conclusive, and she could not in this proceeding be surcharged with this

interest. But she had also the very substantial defense on the merits that, as it was shown before the master, she had after their mother's death expended far more upon the maintenance, support and education of the children, than she had received from Mrs. Anderson's small estate. Had she filed a strict account, the estate would have been much decreased, and she omitted to do so. The account was filed by Mr. Shapley, as her attorney and under his advice. This claim of surcharge is not made in the bill, but the master has given it careful consideration and reports it to be without merit.

" What has been said substantially disposes of the case upon its merits. There were several other questions argued at length before the master, as to which he begs leave to submit his

### " CONCLUSIONS OF LAW.

" First. The burden of proof is upon the complainant to show that Mrs. Anderson at the time of her death was the owner of the securities in question. The usual rule is, that he who asserts ownership must prove it, and the rule is the same in equity as at law: Pusey v. Wright, 31 Pa. 387. The complainant's testimony, in the opinion of the master, has failed to overcome this burden. The agreement is insufficient, because it was not intended to operate as an assertion of ownership; because it was not even written or dictated by Mrs. Anderson, but by a third party; because it was never shown to or seen by Mrs. Harrison and is therefore incompetent to affect her, and because it is explained by a mass of evidence to have been made by Mrs. Anderson in behalf of Mrs. Harrison and to save trouble to her.

" Nor is the burden of proof overcome by Mrs. Anderson's possession of the coupons. At most that would only be proof of the ownership of the coupons, and it would not follow that she was therefore the owner of the bonds from which they were cut. But in fact her possession of the coupons was Mrs. Harrison's possession, as the whole evidence leads to the conclusion that in this matter she was merely an agent so far as Mrs. Harrison's securities are concerned.

" In considering the question of the burden of proof the master has laid no stress upon other considerations which, were it necessary, might be held important. In his opinion,

it should require a very high standard of evidence to prove that after the lapse of ten years an executrix, incompetent herself to testify, has been guilty of gross fraud, embezzlement and perjury. But the master does not think that the complainant has produced sufficient evidence to prove title in Mrs. Anderson, even if the issue were directly between Mrs. Anderson and Mrs. Harrison herself, under circumstances which precluded both from testifying, and if the fact involved were very recent instead of having occurred many years previously.

" Second. In respect to the effect of the answer as responsive to the bill.

" The bill alleged that certain property belonged to Teresa L. C. Anderson, and charges that the defendant as executrix of Mrs. Anderson fraudulently misappropriated it. The answer in the most direct and explicit fashion denies the charge and avers that the ownership of the securities is in the defendant, Mrs. Harrison. The burden of proof was on the complainant to meet the responsive answer and overcome it with two witnesses or one witness and corroborative circumstances. This, in the master's opinion, the complainant has failed to do. Even if the Mason agreement of June 6, 1882, be considered as a corroborative circumstance or consistent with Mrs. Anderson's ownership of the bonds, yet there is not the testimony of a single witness to show that Mrs. Anderson was the owner of them. On the contrary the evidence of the witnesses is the other way.

" It is not necessary for the master to enter into any exhaustive review of the cases upon this familiar rule of equity. The master, however, refers to Eberly v. Groff, 21 Pa. 251, where the answer denied, as in this case, the fraud charged in the bill; and also to Eaton's App., 66 Pa. 483, and the cases which follow it: Rowley's App., 115 Pa. 150; Priestley's App., 127 Pa. 420; Bell v. The Bank, 131 Pa. 318, and particularly Cresson's App., 91 Pa. 168.

" The master thinks that the rule applies in this case, and reports that the bill should, if only for this reason, be dismissed.

" Third. It was urged by the learned counsel for the complainant that Mrs. Anderson was shown to have been in possession of the bonds in dispute, and that this fact of possession settled the question of title or ownership. Under certain cir-

cumstances possession is undoubtedly prima facie evidence of title, but the evidence in this case removes it from the class of cases to which the learned counsel refers. It is evident from a consideration of the circumstances attending the possession of these securities by Mrs. Anderson that she was merely acting as the agent for Mrs. Harrison, and that she was prevented by the fiduciary relation which undoubtedly existed from acquiring by means of such possession or right to handle the securities any adverse title. It shows that Mrs. Anderson had not the possession of these bonds except as representing Mrs. Harrison.

" Fourth. The defendant raised the question of the jurisdiction of this court, claiming that Mrs. Harrison, as executrix, was accountable only in the orphans' court. Her counsel referred to several cases in support of this proposition, but as the case was heard and argued upon its merits the master prefers to decide it in the same manner. The defendant also argued the similar proposition, that the account of Mrs. Harrison being a final account, and having been adjudicated and confirmed as such, was conclusive.

" In support of this were cited Weiting v. Nissley, 6 Pa. 143, and Helfenstein's Est., 135 Pa. 300. These cases appear to the master to sustain the defendant's position. The account purported to be a final account, and the adjudication thereof is a final decree. There were no exceptions and no appeal. It is now too late for a bill of review in the orphans' court under the act of Oct. 13, 1840 (Br. Purdon, 447), and the decree is conclusive. The account is regular on its face, is upon a subject-matter over which the court had jurisdiction, and if this executrix, who has settled her account, had the same adjudicated and confirmed, and paid over the balance ascertained to be due, is to be compelled after the lapse of years to state a new account as a defendant in a bill in equity, no executor or administrator can consider himself finally relieved from responsibility.

" The master, however, having fully considered the case upon its merits, does not think it necessary to pass upon this question, as the parties desired a decision upon the merits.

" The parties to the case agreed that the stenographer's charges should be taxed as part of the costs, and it was subse-

quently agreed that the amount should be $250, of which each party has advanced one half.   The master, upon the conclusion of the testimony and argument, requested the counsel for the parties to agree upon the amount of his fee as examiner and master in the cause.   They reported to him that they were unable to agree upon the amount, and the master is therefore obliged to fix a sum which should be proper under all the circumstances.   The examiner and master began to hold his meetings on March 27, 1893, and held over thirty meetings. The testimony was taken stenographically and the type-written notes number some 500 pages.   Five meetings were held for argument which was concluded May 22, 1894.   In view of the large amount of testimony, the importance of the questions involved in the case, and the labor and attention bestowed by the master upon it, he considers that a fee of fifteen hundred dollars is a proper one under all the circumstances, and he fixes that amount.

" Upon the question of the liability for costs the master sees no reason for departing from the usual rule, that they shall be imposed upon the unsuccessful party to the litigation.   The defendant, in the opinion of the master, has not acted with any fraudulent intent and has been subjected to the expense and annoyance of defending a claim devoid of merit.   The master thinks that the costs of the suit should be paid by the party responsible for it."

Exceptions to the master's report were overruled, and a decree entered dismissing the bill.

*Errors assigned* were in overruling the exceptions and dismissing the bill.

*John Walker Shortledge* and *Thomas R. Elcock,* for appellant, cited as to the insufficiency of the master's findings, Worrall's App., 110 Pa. 362; Rhoades' App., 161 Pa. 549; Gaines v. Brockerhoff, 136 Pa. 195; Kutz's App., 100 Pa. 79.

As to Mrs. Harrison's ownership of the securities, McDermott's App., 106 Pa. 366; Wormley's Est., 137 Pa. 109; Parvin v. Capewell, 45 Pa. 93; Herr's App., 5 W. & S. 494, 499.

As to the insufficiency of the evidence, Kittel's. Est., 156 Pa. 449; Phillips' App., 68 Pa. 138; Holland v. Kindregan, 155 Pa. 158.

As to jurisdiction, Delbert's App., 83 Pa. 473; Harrisburg

Nat. Bank's App., 84 Pa. 384; Willard's App., 65 Pa. 267; Ake & Feay's App., 74 Pa. 119; McBride's App., 72 Pa. 484; Odd Fellows S. Bank App., 123 Pa. 364; Marshall's Est., 138 Pa. 300; Watts's Est., 158 Pa. 13; act of Feb. 24, 1834, P. L. 86; Dundas Est., 73 Pa. 481; Gilliland v. Bredin, 63 Pa. 396; Adams's App., 113 Pa. 455; Evans v. Goodwin, 132 Pa. 146; Myers v. Bryson, 158 Pa. 255; Dickerson's App., 115 Pa. 205; Flickwir's Est., 136 Pa. 374; Townsend's App., 106 Pa. 273; Armstrong v. Walker, 150 Pa. 589; Hall's App., 112 Pa. 55; Weiting v. Nissley, 6 Pa. 143; Kuhns's App., 87 Pa. 103.

As to Mrs. Anderson's possession of the securities, Sawtelle's App., 84 Pa. 306; Black v. Nease, 37 Pa. 439; Cumming's App., 153 Pa. 401; Marsden's App., 102 Pa. 202; Miller v. Springer, 70 Pa. 274; Stewart's Est., 137 Pa. 187.

*John G. Johnson, John Marshall Gest* with him, for appellee, cited on the conclusiveness of the master's findings, Mengas' App., 19 Pa. 221; Bull's App., 24 Pa. 286; Dellinger's App., 71 Pa. 425; Packer v. Noble, 103 Pa. 188; Fahnestock's App., 104 Pa. 46; Yohe's App., 55 Pa. 121; Stehman's App., 5 Pa. 413; Bedell's App., 87 Pa. 510; Stocker v. Hutter, 134 Pa. 19; Sharpsburg Borough v. Saint, 6 Cent. Rep. 142; Coulston's Est., 161 Pa. 151; Brotherton v. Reynolds, 164 Pa. 134.

As to the responsive answer to the bill, Everly v. Groff, 21 Pa. 251; Eaton's App., 66 Pa. 483; Pusey v. Wright, 31 Pa. 387; Burke's App., 99 Pa. 350; Cresson's App., 91 Pa. 168; Priestley's App., 127 Pa. 420; Bell v. Farmers' Bank, 131 Pa. 318.

As to estoppel, Malone's Est., 8 W. N. C. 179; Miller's App., 84 Pa. 391; Eichhorn's Est., 24 W. N. C. 364; King's Est., 12 W. N. C. 109; McDermott's App., 106 Pa. 358.

PER CURIAM, May 13, 1895:

An examination of the master's report in this case, and a careful reading of the testimony in connection therewith, convinces us beyond question that the findings of fact contained in the report are fully sustained by the evidence. The plaintiff's case is entirely devoid of merit, and we affirm the decree of the learned court below upon the conclusions and findings of the master and upon the reasoning contained in the report, the costs of this appeal and all other costs to be paid by the appellant.